**Affirmed as modified; Opinion Filed August 21, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-00287-CR

**JOSEPH GLENN BEATY, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 283rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F15-76098-T**

## MEMORANDUM OPINION

Before Justices Lang-Miers, Evans, and Schenck
Opinion by Justice Evans

Joseph Glenn Beaty was charged by indictment with the aggravated sexual assault of complainant, D.A. A jury convicted appellant of the offense as alleged in the indictment and assessed punishment at life imprisonment. On appeal, appellant raises five issues contending that: (1) the trial court erred by denying his motion to suppress the DNA evidence because the State failed to prove that the evidence was obtained under a valid search warrant; (2) the trial court erred by admitting extraneous offense evidence; (3) the limiting instruction regarding the extraneous offense evidence was defective; (4) the trial court failed to implement his "right to be punished according only to the facts of the case;" and (5) the trial court erred by denying his motion to suppress the DNA evidence because the affidavit was insufficient to establish probable cause that evidence of crime would be found in a sample of appellant's saliva. In three cross-issues, the State

requests that we modify the judgment to reflect a deadly weapon finding; that appellant pleaded "not true" to the enhancement paragraph; and that jury found the enhancement paragraph true. As modified, we affirm the trial court's judgment.

**BACKGROUND**

D.A. testified that growing up she had no parental supervision and became addicted to PCP when she was fourteen years old. She started working in prostitution at that same age. In July, 2009, she lived in the Fair Park area, a known prostitution area. Much of her life involved getting high and working as a prostitute. On July 3, 2009 she was walking down Martin Luther King Boulevard to Minyards when a man in a black four door Lincoln asked her if she wanted a ride, took her to the Minyards, and then waited for her.[1] When she got back in the car, the man said he wanted "to do a date" with her and she agreed. The man drove her to an alley in a secluded area near some railroad tracks where he first pulled out some money but then pulled out a knife and started choking her using both hands. D.A. tried to wrestle with him to get loose and out of the car but she was unable to unlock the door. The man then sexually assaulted her without using a condom. D.A. testified that before he sexually assaulted her, he held the knife up to her throat and she thought that he was going to kill her if she did not comply. She also testified that he was choking her so tightly that she blacked out. After the assault was over, the man threw her and her clothes out of the car. When she got back home, the police were called and she was taken to the hospital where a sexual assault exam was done. When D.A.'s sexual assault kit was tested several years later, there was a positive match to appellant's DNA.[2]

---

[1] During trial, D.A. was unable to identify appellant as the man who sexually assaulted her.

[2] Detective Haecker testified that over the years thousands of sexual assault kits collected by the Dallas Police Department went untested because the department was unwilling to pay for testing on the kits if the case was designated "unfounded" and went "cold" because a victim had a criminal history or did not cooperate with the investigation. Many "cold" cases involved "high-risk victims," i.e., victims with mental health issues, drug issues, prostitution issues, or criminal issues. In 2015, the federal government provided funding to have these kits tested.

During the trial, three other women testified regarding sexual assaults that appellant had committed against them. S.R. testified that in the early morning hours of August 3, 2008, after a night of drinking and smoking PCP at a biker club, she was walking to her children's father's house in Oak Cliff when appellant, driving a four door maroon car on the opposite side of the street asked her if she needed a ride.[3] After she said no and kept walking, appellant made a U-turn, pulled up beside her, grabbed her and put her in the car. S.R. tried to get out of the car, but she could not unlock the door because the power lock did not work. At that point, she fought with appellant but he choked her until she passed out. When S.R. regained consciousness, appellant was having sex with her. She started fighting again, at which point appellant grabbed her and choked her until she lost consciousness again. When she came to the second time, they were in a new location near a barn about ten minutes away from the first location and close to downtown. At that point, S.R. was able to get out of the car and run to people standing outside of some condos who called the police for her. The police took her to Parkland Hospital where a sexual assault exam was done. Testing done several years later on the sexual assault kit resulted in a positive match to appellant's DNA.[4]

B.S. lived in the Fair Park area of Dallas. She was diagnosed with schizophrenia when she was eighteen or nineteen years old, a condition that sometimes affects her memory. B.S. testified that on March 31, 2009, she was trying to go to her mother's house in Irving and walked up to Martin Luther King Boulevard. As she stood on the sidewalk trying to figure out what she was going to do, a black four door car driven by a light-skinned man pulled up to her and started a

---

[3] Arguably, the record shows that S.R. identified appellant in court as the man who sexually assaulted her. During cross-examination, S.R. was asked if she knew who appellant was. She responded, "I know who he is. He's a rapist." When appellant's counsel pressed the issue, claiming that she had previously testified that she could not identify him, S.R. testified that never stated that she could not identify appellant, S.R. stated that she knew who he was "Because he violated me."

[4] *See supra* n. 1.

–3–

conversation. B.S. could not remember the man's face or what was said, but she knew the man wanted her to go with him. Although she had concerns about what kind of person the man was, she got in the car and asked him if he could take her to Irving. The man then drove her to a wooded area, stopped, got out of the car and forced her into the back seat where he sexually assaulted her at knifepoint. B.S. could not remember if he wore a condom during the assault but did not think he did. After the assault was over and the man moved away from her, B.S. got out of the car and, wearing no pants, ran to a nearby gas station where she called 911. A short time later, her mother took her to Parkland Hospital where a sexual assault examination was done.[5] Testing done several years later on the sexual assault kit resulted in a positive match to appellant's DNA.[6]

In 2013, U.W. lived at a motel in Grand Prairie located right on the Grand Prairie/Arlington border. That area was known to be frequented by prostitutes. On July 15, 2013, she was walking to her daughter's house in Grand Prairie when there was a sudden downpour of rain. As she was looking for shelter, a black four door car made a U-turn in a nearby parking lot. Appellant was the driver of the car and offered U.W. a ride. U.W. was grateful for the offer and got in the car. U.W. told appellant she was going to her daughter's house which was across the nearby train tracks. Appellant, however, started driving in the opposite direction and drove U.W. to a remote area behind an abandoned warehouse where he held a knife behind her and sexually assaulted her. Appellant did not use a condom during the assault. When the assault was over, appellant told U.W. to get out of the car. U.W. was still naked and wiped herself with a napkin she had in her purse which she gave to the responding police officer. U.W. refused to go to the hospital for a sexual assault exam.

---

[5] B.S. testified that she did not wait at the gas station for the police to respond to the 911 call because the people in the store made her feel uncomfortable by being rude and making fun of her. Instead, she found someone to take her back to her home where she called her mother and told her what had happened.

[6] *See supra* n. 1.

–4–

Detective Donalson of the Arlington Police Department investigated U.W.'s sexual assault case. Appellant became a suspect in the case due to a CODIS[7] hit on the DNA that was collected as part of the case. On December 9, 2013, Detective Donalson interviewed appellant at the Dallas County criminal courthouse.[8] During the interview, appellant admitted to picking up prostitutes, but was emphatic about the fact that he always wore a condom. Appellant's DNA was found on the napkin U.W. used to wipe herself after she was sexually assaulted.

Detective Haecker investigated the sexual assault cases of D.A., B.S., and S.R. He also investigated the sexual assault cases of two other victims, T.W. and D.Az.,[9] with circumstances similar to those of D.A., S.R., and B.S. Detective Haecker testified to the following similarities in the cases he investigated: (1) all of the cases involved a black four door car, and with the exception of D.A., all the sexual assaults occurred in close proximity to each other in known prostitution areas around Fair Park or South Dallas; (2) with the exception of S.R., all of the victims were prostitutes; (3) all of the assaults were vaginal sexual assaults and occurred in the daytime; (4) a condom was not used in any of the cases; (5) the cases of D.A. and S.R. involved choking to some level of unconsciousness, and the cases of D.A., B.S., and T.W. involved an allegation of a knife or weapon; and (6) DNA linked appellant to all of the victims, except for D.Az. who refused to go to the hospital and have a sexual assault examination done.

---

[7] CODIS is the acronym for the Combined DNA Index System and is the generic term used to describe the FBI's program of support for criminal justice DNA databases which enables federal, state, and local forensic laboratories to exchange and compare DNA profiles electronically. *See* CODIS and NDIS Fact Sheet – FBI, https://www.fbi.gov/services/laboratory/biometric.../codis/codis-and-ndis-fact-sheet (last visited Aug. 13, 2018); Combined DNA Index System (CODIS) – FBI, https://www.fbi.gov/services/laboratory/biometric-analysis/codis. (last visited Aug. 13, 2018).

[8] Detective Donalson testified that she contacted him at the courthouse because her attempts to contact him by other means had failed and she knew he had an unrelated domestic violence case pending in Dallas County. Appellant was not in custody at the time of the interview and voluntarily agreed to talk to the detective.

[9] The initials D.Az. is being used for the name of the fifth victim to distinguish her from the complainant in this case since both victims have first and last names that begin with D.A. Neither T.W. nor D.Az testified at trial. The detective's testimony regarding his investigation of these two additional cases was presented after the detective was cross-examined on what evidence he relied on, other than DNA, to corroborate D.A.'s account of her sexual encounter with appellant.

Detective Haecker interviewed appellant as part of his investigation. The interview was played for the jury. Appellant admitted picking up prostitutes for sex but said that he would never have sex with a prostitute without a condom, that he always paid, and that he never used any kind of force or a weapon with a prostitute. Appellant told the detective that he recognized the complainant, D.A. who he knew to be a prostitute and had multiple sexual encounters with her. Appellant said that S.R. looked familiar but he did not really remember her. Appellant did not recognize B.S. Appellant also told the detective that in 2008, 2009, he bought older model Lincoln cars and he did have one that was black. During the video recorded interview, Detective Haecker served appellant with a search warrant.

## ANALYSIS

### I.  Search Warrant

In appellant's first issue, he contends that the trial court erred by denying his motion to suppress the DNA evidence because the State failed to prove that the search warrant was valid because it did not produce the original warrant and proof as to the contents of the warrant. The State argues that the trial court did not abuse its discretion in denying the motion to suppress because the record supports the trial court's finding that a valid search warrant existed. We agree with the State.

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *Lujan v. State*, 331 S.W.3d 768, 771 (Tex. Crim. App. 2011) (per curiam). In conducting this review, appellate courts employ a bifurcated standard. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). We give almost total deference to a trial court's rulings on questions of historical fact and mixed questions of law and fact that turn on an evaluation of credibility and demeanor, but we review de novo mixed questions of law and fact that do not turn on credibility and demeanor. *Id.*

We view the evidence in the light most favorable to the trial court's ruling, regardless of whether the trial court granted or denied the motion to suppress. *State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011). Therefore, we afford the prevailing party the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from the evidence. *Id*. When, as in this case, the trial court makes findings of fact, we determine whether the evidence, when viewed in the light most favorable to the court's ruling, supports those findings. *Abney v. State*, 394 S.W.3d 542, 548 (Tex. Crim. App. 2013).

If the State intends to justify a search or arrest on the basis of a warrant, it is incumbent on the State to produce the warrant and its supporting affidavit for inspection by the trial court. *Etheridge v. State,* 903 S.W.2d 1, 19 (Tex. Crim. App.1994) (arrest); *Moreno v. State,* 858 S.W.2d 453, 461 (Tex. Crim. App. 1993) (search); *De La O v. State,* 127 S.W.3d 799, 801 (Tex. App.—San Antonio 2003, pet. ref'd) (search). This procedure allows the trial court to review the documents and determine whether probable cause exists and whether the accused's rights have been protected. *Etheridge,* 903 S.W.2d at 19; *Garrett v. State,* 791 S.W.2d 137, 140 (Tex. Crim. App. 1990). Courts have excused the State from compliance with this production requirement if the State introduces testimony from the magistrate who issued the warrant, the deputy who presented the probable cause affidavit for the warrant, or another witness familiar with the factual basis for the warrant. *See Dorsey v. State,* 964 S.W.2d 701, 704 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd). Presentation of such other evidence suffices if the accused has the opportunity to cross-examine the witness concerning the validity of the warrant and the trial court has an adequate opportunity to determine whether probable cause existed. *De La O,* 127 S.W.3d at 801.

In this case, during the hearing on the motion to suppress, the affidavit for the search warrant was admitted into evidence; the original signed search warrant was not entered into evidence. However, the State offered a copy of the unsigned warrant in the form of a Word

–7–

document that Detective Haecker testified he sent from his computer to the prosecutor which accurately reflected the warrant that was served on appellant. Detective Haecker testified that Judge Birmingham signed the warrant and the probable cause affidavit. After they were signed, Detective Haecker took the warrant to the jail where he interviewed appellant. He testified that during the interview, he gave appellant the warrant that had been signed by Judge Birmingham and appellant took the warrant back with him to his cell. The detective kept the signed affidavit. The detective testified that he did not make a copy of the signed search warrant before he met with appellant and that appellant had the only signed copy. He testified that the affidavit and the warrant were both signed at the same time and date. A video showing the detective giving appellant the search warrant during the interview was admitted into evidence.

Judge Birmingham testified that he signed both the affidavit and the search warrant. He specifically recalled doing so because of the odd spelling of the detective's name and some of the facts contained in the documents. Judge Birmingham also testified that he had never been presented with a probable cause affidavit without a warrant. Further, if he had been presented with a probable cause affidavit without a warrant, he would not have signed the affidavit.

At the end of the hearing, the trial court denied the motion to suppress and found that based upon the testimonies of the detective and the judge, the reconstructed warrant admitted into evidence accurately reflected the warrant for the search.

During the trial,[10] Detective Haecker testified to the same facts before the jury regarding the search warrant as he testified to during the hearing on the motion to suppress. The video

---

[10] In this case, the testimony at trial regarding the search warrant can also be used to support the trial court's decision on the motion to suppress after the pretrial hearing. While the general rule is that the reviewing court may not consider evidence introduced after the suppression hearing, consideration of the relevant trial testimony is appropriate where the issues involved in the pre-trial suppression hearing have been consensually relitigated by the parties during trial on the merits. *See Black v. State,* 362 S.W.3d 626, 635–36 (Tex. Crim. App. 2012); *Perez v. State,* 495 S.W.3d 374, 387 (Tex. App.—Houston [14th Dist.] 2016, no pet.). The record shows that appellant relitigated the warrant issue during trial through his cross-examination of Detective Haecker and Judge Birmingham.

showing the detective giving appellant the search warrant was also admitted into evidence before the jury. Judge Birmingham also testified during the trial and explained the process involved in signing a search warrant. Judge Birmingham again testified that he specifically recalled signing the affidavit and search warrant presented to him by Detective Haecker, that the unsigned warrant admitted into evidence was an exact copy of the warrant signed by him, and that it was a valid warrant.

The trial court also entered findings of fact. In those findings, the trial court found that both Detective Haecker and Judge Birmingham were credible witnesses; that Judge Birmingham issued a warrant authorizing the taking of appellant's DNA on the same day the affidavit was presented and sworn to before him by Detective Haecker; that Detective Haecker did not make a copy of the search warrant and served the original on appellant when he executed it; that the original warrant was last in appellant's possession and no copy is known to exist; and that State's Exhibit 100 was an accurate reconstruction of the original search warrant. We defer to those findings. *See Gonzales v. State,* 369 S.W.3d 851, 855 (Tex. Crim. App. 2012) ("We see no reason to second-guess the trial court's determination of an issue that is supported by the record and depends so much on credibility and demeanor."). While the record reflects that appellant objected to the introduction of the reconstructed warrant, cross-examined the judge and the detective regarding the preparation and issuance of the warrant, he did not offer evidence to contradict their testimony.

Based on this record, we conclude the trial court properly denied the motion to suppress. We need not address the claims in appellant's briefs regarding the validity of the warrant based on its contents as appellant never objected on that basis during the hearing on the motion to suppress

or at trial.[11] *See* TEX. R. EVID. 33.1; *Sterling v. State,* 800 S.W.2d 513, 521 (Tex. Crim. App. 1990) ("Generally, error must be presented at trial with a timely and specific objection, and any objection at trial which differs from the complaint on appeal preserves nothing for review."). We overrule appellant's first issue.

## II.     Extraneous Offense Evidence

In his second issue, appellant contends that the trial court erred by allowing testimony about sexual assaults appellant committed on other women. The State argues that the extraneous sexual assaults were relevant to the issues of intent and consent and that the probative value outweighs the prejudicial value. We agree with the State.

We review a trial court's decision to admit or exclude evidence of extraneous offenses under an abuse-of-discretion standard. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). The trial court does not abuse its discretion unless its decision to admit or exclude the evidence lies outside the zone of reasonable disagreement. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009). We will uphold the trial court's evidentiary ruling if it was correct on any theory of law applicable to the case. *See De La Paz*, 279 S.W.3d at 344.

Texas Rule of Evidence 404(b)(1) states that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a defendant in order to show he acted in conformity therewith. TEX. R. EVID. 404(b)(1); *Segundo v. State*, 270 S.W.3d 79, 87 (Tex. Crim. App. 2008). However, extraneous offense evidence may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or

---

[11] In addition to the absence of a signed warrant, appellant's objections also went to the search warrant affidavit claiming that the magistrate was misled by information in the affidavit because the detective omitted information pertaining to the credibility of the complaining witness. In his fifth issue on appeal, appellant contends the affidavit is insufficient to establish probable cause.

–10–

accident. TEX. R. EVID. 404(b)(2); *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). This list is illustrative, not exhaustive. *De La Paz*, 279 S.W.3d at 343. Extraneous offense testimony may also be admitted to rebut a defensive issue by negating one of the elements of the offense. *Id.; Casey,* 215 S.W.3d at 879. When the defensive theory of consent is raised in a sexual assault case, a defendant necessarily disputes his intent to do the act without the consent of the complainant and his intent is thereby placed in issue. *Martin v. State*, 173 S.W.3d 463, 467 n.1 (Tex. Crim. App. 2005). Such intent cannot be inferred from the mere act of intercourse with the complainant. *Rubio v. State,* 607 S.W.2d 498, 501 (Tex. Crim. App. 1980); *Brown v. State*, 96 S.W.3d 508, 512 (Tex. App.—Austin 2002, no pet.).

Additionally, evidence of a defendant's particular modus operandi is a recognized exception to the general rule precluding extraneous offense evidence, if the modus operandi evidence tends to prove a material fact at issue, other than propensity. *Casey,* 215 S.W.3d at 880. In the context of extraneous offenses, modus operandi refers to "a defendant's distinctive and idiosyncratic manner of committing criminal acts." *Id*. at 881. Although the modus operandi theory of admissibility under Rule 404(b) usually refers to evidence offered to prove the identity of a specific person, its use is not so limited in the law. *Id*. Modus operandi may also encompass the "doctrine of chances" theory to show lack of consent, motive, and the manner of committing an offense. *Id*. The doctrine of chances is "the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all." *Brown*, 96 S.W.3d at 512. For the doctrine to apply, there must be a similarity between the charged and extraneous offenses, since it is the improbability of a like result being repeated by mere chance that gives the extraneous offense probative weight. *Id*. No rigid rules dictate what constitutes sufficient similarities. *Segundo,* 270 S.W.3d at 88; *Brooks v. State,* No. 05-16-00182-CR, 2017 WL 4785331, at *10 (Tex. App.—

Dallas October 24, 2017, no pet.) (mem. op., not designated for publication). An extremely high degree of similarity is not required where intent, as opposed to identity, is the material issue. *Cantrell v. State,* 731 S.W.2d 84, 90 (Tex. Crim. App. 1987); *Brown*, 96 S.W.3d at 513; *Wiggins v. State*, 778 S.W.2d 877, 886 (Tex. App.—Dallas 1989, pet. ref'd).

D.A. testified on direct-examination that she was a prostitute, voluntarily took a ride from appellant, and agreed to do a date with him. She also testified that she did not discuss where they were going to do the date but after he drove her to a back street, he pulled out some money and it looked like it was going to be a typical date. However, instead he pulled out a knife and started choking her using both hands. He then sexually assaulted her. D.A. testified that before appellant sexually assaulted her, he held the knife up to her throat and she thought that he was going to kill her if she did not comply. She testified that he was choking her so tightly that she blacked out. D.A. also testified that she has had incidences where customers did not pay her, but she did not consider that to be rape and has never called the police under such circumstances.

During his cross-examination of D.A., appellant's counsel questioned D.A.'s credibility regarding her lack of consent to the sexual encounter and attempted to discredit her testimony regarding appellant choking her and threatening her with a knife. Appellant's counsel suggested that D.A. could not have seen a knife in appellant's hand if, as she said, appellant was choking her with both hands around her neck. Counsel suggested that if D.A. was high on PCP the day of the assault or blacked out from being choked as she claimed, she really did not know what happened to her. Counsel implied that because D.A. consented to the sex, she was now claiming that she had been sexually assaulted because she was upset that appellant did not pay her for the date since appellant's failure to pay came right on the heels of another client having failed to pay.[12] Counsel

---

[12] D.A. testified that she was going to the Western Union at Minyards to get some money which one of her clients was supposed to be sending her. However, the money never came through to her that day.

insinuated that D.A. was falsely calling this encounter a sexual assault because she claimed that she had been the victim of rape many times before but yet had never called the police. Counsel suggested that if appellant had sexually assaulted her using a knife as she had claimed, she would not have gotten into a car with appellant again years later, and would not have been reluctant to report the second sexual assault by the same man to the police.[13] And counsel implied that if D.A. had been sexually assaulted by appellant by force, and was scared for her life, she would not still be prostituting and getting in cars with strangers.

During cross-examination of the doctor and the investigating detective, counsel also implied that D.A.'s testimony about appellant threatening her with a knife was not credible because her description of where he held the knife to her, i.e., head, throat or temple, was inconsistent. Counsel also questioned the doctor and detective about the lack of evidence showing any injury or trauma to D.A.'s neck, again implying that D.A.'s testimony about appellant choking her during the assault was unbelievable. During closing argument, appellant's counsel expressly suggested that not only did D.A. lie about being sexually assaulted but all the other prostitutes who testified that appellant sexually assaulted them also lied because appellant did not pay them after they had consented to sex.

We conclude that all of the suggestions, implications, and insinuations made by counsel's cross-examinations and closing argument, raise the defensive theory that D.A. must have consented to sex with appellant. Therefore, we disagree with appellant's assertion that the testimony of S.R., B.S., and U.W. did not rebut his defensive theory.

---

[13] D.A. testified that she got into the car with this man a second time years later and that he again pulled out a knife and sexually assaulted her. She stated that this time she could not do anything about it because she was pregnant. She stated that when she got in the car with him, she did not remember who he was until he pulled out the knife. She also stated that she did not report the second incident to the police because she was probably high.

–13–

Further, the extraneous-offense testimony is sufficiently distinctive and similar to the charged offense as to qualify as modus operandi evidence relevant to the issue of consent – (1) all the cases involved a dark colored four-door car – D.A., B.S., and U.W. testified that the car was black, S.R. testified that it was maroon; (2) in each case, the child safety locks were engaged in the car; (3) all four women were picked up during the daytime in a known prostitution area and were taken to a secluded area; (4) all of the cases involved the use of force – the cases of D.A., B.S., and U.W. involved an allegation of a knife; the cases of D.A. and S.R. involved choking to some level of unconsciousness; (5) a condom was not used in any of the assaults; (6) all of the women were left stranded after the assault; (7) with the exception of S.R., all of the victims were prostitutes; (8) the assaults on D.A., S.R., and B.S occurred in close proximity to each other in either the Fair Park area or South Dallas; and (8) DNA linked appellant to all of the victims.

On this record, we conclude the trial court did not abuse its discretion in determining that the extraneous offense evidence was admissible because it rebutted a defensive issue raised by appellant and/or constituted evidence of a particular modus operandi. *See Martin*, 173 S.W.3d at 468 (extraneous offense testimony demonstrated modus operandi "sufficiently distinctive" to fall within rule 404(b)(2) where evidence showed appellant falsely claimed to be law enforcement officer as ruse to "pick up" the women, both women agreed to meet appellant in residential area in first face-to-face meeting after initial contact, and both women were sexually assaulted by appellant in residence upon meeting with him); *Brown*, 96 S.W.3d at 513 (extraneous offense evidence offered to rebut consent of victim was admissible where evidence showed appellant picked up three different women with drug addictions or criminal backgrounds in similar neighborhoods, took them to remote areas, sexually assaulted them, and left them stranded with little or no clothing); *Brooks,* 2017 WL 4785331, at \*12 (extraneous offense evidence admissible where evidence showed appellant held victims at gunpoint, sexually assaulted them from behind,

or attempted to do so, used a condom, stole their cell phones and other belongings, told them to count to 300 and fled while they were counting, and all three incidents took place during the same year within close proximity to appellant's apartment).

The extraneous offense evidence also met the requirements of rule 403 of the Texas Rules of Evidence because the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403; *Casey,* 215 S.W.3d at 882–84. Rule 403 provides that a trial court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. *Id.* When undertaking a rule 403 analysis, a trial court must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *See Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

The first two factors weigh strongly in favor of admissibility. As set forth above, appellant put his intent to commit the charged offense at issue by raising the defensive theory that D.A.'s testimony about the incident was not credible and that she consented to the sexual encounter. Because the extraneous offense evidence was so similar to the charged offense, it was highly probative as modus operandi evidence to rebut the issue of appellant's intent to commit the offense. *See Grant v. State*, 475 S.W.3d 409, 420–21 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (extraneous offense that was similar to charged sexual assault was "highly probative" and necessary, where defendant challenged victim's credibility and lack of consent); *Brooks*, No. 05-

–15–

16-00182-CR, 2017 WL 4785331, at \*12 (same) *Hill v. State*, No. 05–15–00989–CR, 2017 WL 343593, at \*5 (Tex. App.—Dallas Jan. 18, 2017, pet. ref'd) (mem. op., not designated for publication) (same). Further the State's need for this testimony was also significant. Appellant argues that the jury could infer a lack of consent from D.A.'s testimony that appellant brandished a knife. However, appellant attacked D.A.'s credibility at trial and there was no physical evidence to support her accusation. The extraneous offense evidence was consistent with D.A.'s account of the sexual encounter with appellant and, like all corroborating evidence, had a tendency to make her testimony more plausible. Without the benefit of the extraneous offense evidence, D.A.'s testimony could have been easily discounted by the jury due to her use of PCP and her sometimes confusing testimony at trial regarding the sexual assault. *See Casey,* 215 S.W.3d at 884 ("[W]ithout the benefit of the [extraneous offense evidence, the complainant's] testimony could have been easily discounted by the jury due to her intoxication and intermittent recollection of events."); *see also Grant*, 475 S.W.3d at 421 (evidence that complainant called the police, went to the hospital, and had physical injuries and her personal identification stolen did not discredit appellant's argument that complainant voluntarily went to the apartment building as an escort).

The third and fourth factors also weigh in favor of admissibility. The extraneous offenses were of similar nature to the charged offense and no more heinous than the crime for which appellant was indicted, and therefore unlikely to create such prejudice in the minds of the jury that it would have been unable to limit its consideration of the evidence to its proper purpose. *See Grant,* 475 S.W.3d at 421; *Brooks*, 2017 WL 4785331, at \*13. Further the jury charge contained an instruction that properly limited the jury's reliance on the extraneous offense evidence to the reasons set forth in Rule 404(b), as requested by appellant. Thus, the jury charge correctly instructed the jury to limit its use of the extraneous offense evidence to issues that were properly before it. *See Blackwell v. State,* 193 S.W.3d 1, 16 (Tex. App.—Houston [1st. Dist.] 2006, pet.

ref'd) (trial court's instructions to jury are a factor to consider in determining whether jury considered extraneous offense evidence improperly).

The fifth factor also favors admissibility. The risk of the jury giving the evidence undue weight on other than emotional grounds often refers to evidence of a scientific or technical nature that the jurors are not properly equipped to evaluate. *See Casey,* 215 S.W.3d at 880. As noted by the State, the only thing scientific or technical about the extraneous offense evidence in this case was the DNA evidence. DNA evidence is often presented to juries in criminal trial and was presented in this case not only to prove the extraneous offense evidence but also to prove that appellant committed the assault against D.A. As in *Segundo*, the DNA evidence was calculated to result in a rational decision based upon modern science, genetic fingerprinting, and probabilities. *See Segundo,* 270 S.W.3d at 90.

The last factor looks to the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense. *See State v. Mechler,* 153 S.W.3d 435, 441 (Tex. Crim. App. 2005). Appellant accurately notes that the State spent a great deal of time proving the extraneous offenses. However, in order to be admissible, and considered by the jury, the extraneous offenses had to be proven relevant to one of the purposes stated in Rule 404(b) or some other recognized exception, and had to be proven beyond a reasonable doubt. Much like the extraneous offense evidence in *Segundo,* this required a long list of witnesses and a slow plod through the pertinent medical and scientific evidence. *See Segundo,* 270 S.W.3d at 90. We find that this factor does not weigh heavily against admissibility.

On this record, we conclude the trial court did not abuse its discretion by admitting the extraneous offense testimony about sexual assaults committed by appellant on other women. We overrule appellant's second issue.

## III. Jury Charge

In appellant's third issue, he contends that the trial court erred in its oral and written instructions about the probative value of the extraneous offense evidence and that as a result he suffered egregious harm. Appellant complains that the instruction was too broad and should have been restricted in scope to the limited purpose of "absence of mistake;" the instruction did not explain that to be admissible, the extraneous conduct must constitute a "signature;" the instruction did not define "offense;" and the "garbled" wording of the statement of limitation expressed in the oral instruction was unlikely to convey the meaning of rule 404(b)(1) to the jurors.

When evidence that is admissible for one purpose but not for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly. *See* TEX. R. EVID. 105(a). When the State is permitted to introduce evidence of appellant's extraneous acts for a limited purpose, appellant has the burden of requesting an instruction limiting consideration of those acts. *See Ex parte Varelas*, 45 S.W.3d 627, 631 (Tex. Crim. App. 2001). The request for a limiting instruction must inform the trial court as to what limitations should be placed upon the evidence. *See Wells v. State,* 241 S.W.3d 172, 178 (Tex. App.—Eastland 2007, pet. ref'd) (citing *Puente v. State,* 888 S.W.2d 521, 528 (Tex. App.—San Antonio 1994, no pet.). It is the scope of the limited instruction given, or not given, at the time the evidence is introduced that defines for what purpose the jury can consider the evidence. *See Thibodeaux v. State.* No. 10-13-00466-CR, 2015 WL 4638297, at *2 (Tex. App.—Waco July 30, 2015, no pet.) (mem. op., not designated for publication). If a party does not request a limiting instruction at the time the evidence is admitted, and the evidence is admitted without a limiting instruction, then the evidence becomes part of the general evidence and may be used for all purposes. *Hammock v. State,* 46 S.W.3d 889, 895 (Tex. Crim. App. 2001).

Here, after the trial court determined that the extraneous offense evidence proffered by the State was admissible, appellant requested that the trial court instruct the jury on the standard of proof required for admitting extraneous offenses and that such evidence could only be considered for the "reason in 404."[14] In accordance with that request, prior to the introduction of that evidence, the trial court gave a limiting instruction which informed the jury that:

> [Y]ou can only consider this evidence of an extraneous offense if you believe the State has proved the extraneous offense beyond a reasonable doubt. And you may only consider it for the purpose of the limited purpose of proving the motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident, and you cannot consider it for the purpose of determining that the defendant acted in conformity with a certain type of behavior.

There was no objection to the instruction at the time it was given. Thus, appellant's complaints about the oral instruction present nothing for review. *See* TEX. R. APP. P. 33.1.

Appellant's complaints about the limiting instruction in the jury charge also fail. When we review alleged jury charge error, we must first determine whether error exists. *See Artega v. State,* 521 S.W.3d 329, 333 (Tex. Crim. App. 2017) (citing *Barrios v. State,* 283 S.W.3d 348, 350 (Tex. Crim. App. 2009)). If error is found, we then determine whether the defendant was harmed by that error. *Id.*

The limiting instruction given in the charge in this case was the same limiting instruction given to the jury when the evidence was admitted. Like the oral instruction, the jury charge incorporated all the reasons set forth in Rule 404(b) for which extraneous offense evidence may be admissible. Just as when no limiting instruction is requested, no charge instruction is necessary, the trial court does not err by failing to give a more restrictive instruction on the scope of the use

---

[14] Rule 404(b) provides that extraneous offense evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. TEX. R. EVID. 404(b)(2).

of the evidence in the charge to the jury than what was given initially without objection. *Thibodeaux,* 2015 WL 4638297, at *2; *Hammock,* 46 S.W3d at 895.

Further, the trial court did not err by failing to explain that to be admissible, the extraneous offense must constitute a "signature." The trial court does not have a sua sponte duty to instruct the jury on all potential defensive or evidentiary issues, and is not bound to give instructions that the party did not request. *See Delgado v. State,* 235 S.W.3d 244, 249 (Tex. Crim. App. 2007). Rule 404(b) is a rule of evidence which dictates the purposes for which extraneous offense evidence may be admitted. Whether the extraneous offense was relevant to the issue of identity because it could be considered the defendant's "signature" has to do with the admission of the evidence. *See Page v. State,* 213 S.W.3d 332, 336 (Tex. Crim. App. 2006). Texas courts are not required to instruct juries on evidentiary rules. *See Milner v. State,* 262 S.W.3d 807, 809 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (*and cases cited therein*) (article 38.36(a) instruction not required).[15] The jury in this case was adequately charged concerning assessment of the extraneous conduct evidence through the limiting instruction requested by appellant.

The trial court also did not err by failing to define "offense." Words which are not statutorily defined are to be given their usual meanings and no specific instructions are required. *See Martinez v. State,* 924 S.W.2d 693, 698 (Tex. Crim. App. 1996). Appellant has not cited any statutory definition of the term "offense," nor are we aware of one. Thus, the trial court's failure to define the term does not constitute error.

Finding no error in the jury charge, we do not consider whether appellant was harmed. We overrule appellant's third issue.

---

[15] *See also Gold v. State,* 691 S.W.2d 760, 764 (Tex. Crim. App. 1985) ("If the rule of evidence is properly applied at trial, evidence admitted and argument thereon permitted, the jury is adequately charged with their general instructions concerning assessment of evidence presented during trial.").

**IV.    Punishment Phase Argument regarding Extraneous Criminal Conduct**

In his fourth issue, appellant contends that the trial court "violated its duty by failing to implement Appellant's right to be punished according only to the facts of the case." Appellant claims that the prosecutor's closing argument urged the jury to punish appellant collectively for all the extraneous offenses admitted into evidence during the trial when he asked the jury to think about those women by stating "When will those victims feel like justice has been served?", and also asked the jury to "Think about what he did to S.R." Appellant acknowledges that he did not object to the prosecutor's argument, but argues that trial counsel's failure to object is excused under the "right not recognized" exception to the contemporaneous objection rule. The State argues that nothing is preserved for review. We agree with the State.

The right to a trial untainted by improper jury argument is forfeitable. *Hernandez v. State,* 538 S.W.3d 619, 622 (Tex. Crim. App. 2018) (citing *Cockrell v. State,* 933 S.W.2d 73, 89 (Tex. Crim. App. 1996)); *see also Threadgill v. State,* 146 S.W.3d 654, 670 (Tex. Crim. App. 2004). Erroneous jury argument must be preserved by objection pursued to an adverse ruling; otherwise, any error from it is waived. *Hernandez,* 538 S.W.3d at 623. This is true even assuming a prosecutor's argument was so egregious that an instruction to disregard would be ineffectual. *Id.* (citing *Estrada v. State*, 313 S.W.3d 274, 303 (Tex. Crim. App. 2010)). Because appellant did not object to the prosecutor's argument, he presents nothing for us to review.[16]    We overrule appellant's fourth issue.

---

[16] In *Sanchez v. State,* the Court of Criminal Appeals noted, "The 'right not recognized" exception to the contemporaneous-object[ion] rule relates to a kind of fundamental error that is contrary to a specific act of the legislature, and that *Marin* generally eliminated from our jurisprudence." 120 S.W.3d 359 (Tex. Crim. App. 2003) (citing *Marin v. State*, 851 S.W.2d 275 (Tex. Crim. App. 1997)), *overruled in part by Cain v. State,* 947 S.W.2d 262, 264 (Tex. Crim. App. 1997).

## V.    Search Warrant Affidavit

In appellant's fifth issue, he contends that the trial court erred in denying his motion to suppress the DNA evidence because the affidavit was insufficient to establish probable cause that evidence of a crime would be found in a sample of appellant's saliva. We conclude that appellant failed to preserve his complaint for our review.

As an appellate court, we generally review a trial court's ruling or an objection to its refusal to rule. *See* TEX. R. APP. P. 33.1(a)(2); *Mendez v. State*, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004). "The two main purposes of requiring a specific objection are to inform the trial judge of the basis of the objection so that he has an opportunity to rule on it and to allow opposing counsel to remedy the error." *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). This is called preservation of error and "is a systemic requirement on appeal." *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009) (footnote omitted). To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context. *See* TEX. R. APP. P. 33.1(a)(1). We are not hyper-technical in examination of whether error was preserved, but a complaint on appeal must comport with the complaint made at trial. *See Bekendam v. State*, 441 S.W.3d 295, 300 (Tex. Crim. App. 2014). If an issue has not been preserved for appeal, we should not address it. *Clark*, 365 S.W.3d at 339. This is because if an appellant fails to preserve a complaint nothing is presented for our review. *See Sterling v. State*, 800 S.W.2d at 521 ("Generally, error must be presented at trial with a timely and specific objection, and any objection at trial which differs from the complaint on appeal preserves nothing for review.").

In this case, appellant filed a motion to suppress the DNA evidence challenging the search warrant on two grounds: (1) The affidavit upon which the search warrant was based was improperly and illegally executed; (2) The search warrant was illegally issued because the issuing

magistrate was misled by information in the affidavit. At the hearing on the motion, appellant's counsel questioned the investigating detective who had obtained the warrant about facts which were omitted from the affidavit pertaining to the complainant's mental health issues and the inconsistent statements the complainant made to the original investigating officer.[17] Counsel then made the following argument as to why the DNA evidence should be suppressed:

> [Defense Counsel]: Okay. So DNA was used in F15-76000 as well as F15-76098. Detective Haecker testified that he only obtained one search warrant and that was a warrant based upon the facts in F15-76000. Therefore, we are asking that DNA be suppressed as relates to F15-76098 because Detective Haecker could have outlined another PC affidavit as it relates to F15-76098 and attempted to get a swab specifically for that case.
>
> There's nothing to suggest, number one, that a magistrate would have given Detective Haecker a search warrant in F15-7098. That's one issue that we have. The other issue that we have is that in F15-76000, under a *Franks* analysis, this officer left out and omitted – knowingly omitted. He's saying that he doesn't recall specifically what was in the reports that he reviewed as relates to the original officer, but he at a very minimum admits that he knew that she had mental health issues and he did not include that because mental health people can be raped. That is fine. That's not his job to determine probable cause.
>
> This particular magistrate was denied an opportunity to decide the credibility of this particular witness's – of this particular witness under the totality of the circumstances by omitting information about the fact that that particular person had been inconsistent by omitting information about the fact that the original officer or detective or whomever, however their department was set up, that they found the allegation that she made to be unfounded, as well as omitting information about her mental health history, which is significant.
>
> It's for those reasons that we are asking that the search warrant for the DNA be denied in F15-7600, and then, there's just not a search warrant at all in F15-76098.

---

[17] At the time of this pretrial hearing, appellant had been indicted for two aggravated sexual assault cases in cause numbers F15-76000 and F15-76098 and one sexual assault case in cause number F15-76103. This pretrial hearing was for all three cases, as the State had not yet determined if the cases would be tried together or separately. Detective Haecker testified that the affidavit for the search warrant was based upon the facts that were obtained during the investigation relating to the complainant in the aggravated sexual assault case filed against appellant in trial court cause number F15-76000.

The State argued that appellant's motion was not sufficient to trigger a *Franks*[18] issue and that none of the testimony was relevant because it went beyond the four corners of the search warrant affidavit, to which counsel responded:

> [Defense counsel]: Perfect. Your Honor, while I can appreciate the State's argument, the specific language that's used in the motion that was filed had to do with a magistrate being misled. And this officer made it very clear that he knew certain things yet he decided to disregard those things. Now they may want to argue whether or not it was reckless or not, but he specifically omitted information that should not have been omitted. He actually admitted on the stand that that information is important in making a probable cause determination, and he left that out. So we are asking that their [warrant] be suppressed.
>
> And I forgot to mention the fact that I also take issue with the extraneous offense. He went into various extraneous offenses in this particular affidavit which in my opinion takes away any neutrality of the magistrate. Because what he's essentially trying to do is say, hey, look at all these other bad acts that he's been accused of, so now he should go ahead and grant this for this particular one. We don't do that for any other affidavits that we do. He even admitted, well, maybe sometimes I mention someone's criminal history. But there's no realm here in our justice system where we allow extraneous offenses to be brought in at such an early point for the purpose of basically trying to move a case along.

The trial court denied the motion to suppress stating that it did not believe the motion triggered review of outside facts, and that even if it the court had the additional facts, the court believed that there was probable cause.

Three days later, prior to voir dire, the motion to suppress hearing continued. The State offered an unsigned copy of the warrant to which counsel objected and renewed the motion to suppress on the "additional basis being that there literally is no search warrant." Following further testimony from Detective Haecker and Judge Birmingham, the judge who signed the original search warrant, appellant's counsel made no additional objections, and the trial court again denied the motion to suppress. At trial, during the testimony of Detective Haecker and Judge

---

[18] *Franks v. Delaware,* 438 U.S. 154 (1978) (defendant is entitled to an evidentiary hearing when the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by affiant in the warrant affidavit, and the allegedly false statement is necessary to the finding of probable cause).

Birmingham, as well as other witness testimony pertaining to the DNA evidence, counsel simply renewed her previous objections to the affidavit and search.

Appellant's complaint on appeal is that the affidavit was insufficient to establish probable cause that evidence of a crime would be found through the collection and analysis of a sample of appellant's saliva. Defense counsel never objected on this basis at trial or during the pretrial hearings. We conclude that appellant's complaint on appeal was not preserved for appellate review because it does not comport with his objection at trial and therefore presents nothing for us to review.

Further, even if the complaint had been properly preserved for review, we conclude that the affidavit established a substantial basis for the magistrate to find probable cause that appellant's DNA would constitute evidence connecting him to a crime. Appellant's argument that the affidavit failed to provide any reason for crediting the source of the information regarding the accuracy and reliability of the tests performed by Cellmark Forensic Laboratory or DPS is belied by the statement that appellant's DNA had been linked to three additional Dallas Police Department offenses with previously untested sexual assault kits. We overrule appellant's fifth issue.

## VI.    Modification of Judgment

In three cross-issues on appeal, the State requests that we modify the judgment to reflect a deadly weapon finding, that appellant pleaded "not true" to the enhancement paragraph, and that the jury found the enhancement paragraph true. The trial court's judgment shows no findings on a deadly weapon, and shows no plea or findings on the enhancement paragraph. However, the indictment shows that appellant was charged with aggravated sexual assault and that he "used and exhibited a deadly weapon, to-wit: A KNIFE." The indictment also included an enhancement paragraph. The trial record shows that the jury found appellant guilty of aggravated sexual assault, "as included in the indictment." The record also shows that appellant plead "not true" to the

enhancement paragraph and that the jury found the enhancement paragraph to be true. Accordingly, we modify the judgment to reflect that appellant pled not true to the enhancement paragraph and that there was a finding of true to the enhancement paragraph. We also modify the judgment to include a deadly weapon finding. *See Crumpton v. State,* 301 S.W.3d 663, 664 (Tex. Crim. App. 2009) (jury verdict finding defendant guilty "as included in the indictment" constitutes a finding the defendant used a deadly weapon when indictment alleges use of a deadly weapon); *Polk v. State,* 693 S.W.2d 391, 394 (Tex. Crim. App. 1985) (if indictment by allegation specifically places the issue before the trier of fact, affirmative finding is de facto made when the defendant is found guilty "as charged in the indictment"); *see also* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd.).

## CONCLUSION

As modified, we affirm the trial court's judgment.


/David Evans/
DAVID EVANS
JUSTICE


Do Not Publish
TEX. R. APP. P. 47
170287F.U05

–26–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JOSEPH GLENN BEATY, Appellant

No. 05-17-00287-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 283rd Judicial District Court, Dallas County, Texas
Trial Court Cause No. F15-76098-T.
Opinion delivered by Justice Evans, Justices Lang-Miers and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

The Section entitled "Findings on Deadly Weapon" is modified to state "Yes, not a firearm."

The Section entitled "Pleas to 1st Enhancement Paragraph" is modified to state "Not True."

The Section entitled "Findings on 1st Enhancement Paragraph" is modified to state "True."

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered this 21st day of August, 2018.